## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION


| | | |
|---|---|---|
| Donna J. Powers, | ) | CASE NO. 1:05 CV 1596 |
| Administratrix of the Estate of Cleon | ) | |
| Oliver, | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | |
| County of Lorain, et al., | ) | <u>Memorandum of Opinion and Order</u> |
| | ) | |
| Defendants. | ) | |


### INTRODUCTION

This matter is before the Court upon Defendants' Motion for Summary Judgment (Doc. 57). This case arises out of the death of Cleon Oliver. For the reasons that follow, the motion is GRANTED with respect to counts one and three. Count two is DISMISSED without prejudice.

### FACTS

Plaintiff, Donna J. Powers, as the administratrix of the estate of Cleon Oliver, brings this action against defendants, County of Lorain and Sheriff Phil R. Stammitti (sometimes collectively "defendants") asserting wrongdoing in connection with Oliver's death.

1

On December 19, 2003, at approximately 1:15 a.m., Oliver was arrested for driving with a suspended license.  Shortly thereafter, Oliver was taken to the Lorain County Correctional Facility ("LCCF") at which point a search of Oliver's person was conducted.  During the search, the corrections officer discovered a baggie containing a hard white substance, which tested positive for crack cocaine.  After the search, at approximately 2:17 a.m., Oliver was delivered to booking.        It appears that, from 2:17 a.m. until 3:47 a.m., a corrections officer booked Oliver.  The booking process includes completion of a medical screening form.  In response to certain questions on the form, Oliver admitted that he uses marijuana and crack cocaine.  He further admitted that he used drugs or alcohol that night.  According to the corrections officer, Oliver was able to respond to the questions, which placed him "above 90%" of the inmates booked during the midnight shift.  Oliver did not indicate any medical problem at this time, nor did he appear to be suffering from any medical condition.

The medical screening form was taken to the nurse responsible for conducting the "nurse's intake."  At approximately 4:30 a.m., Weber, a licensed practical nurse, conducted a nurse's intake on Oliver.  At this time, Oliver was alert, oriented and cooperative.  Weber reviewed Oliver's medical screening responses with him.  He denied any medical complaints.  Oliver admitted that he used marijuana that night, but denied consuming alcohol.  In addition, he indicated that he had not used cocaine in the past seven days.

Twenty minutes later, a corrections officer transported Oliver to his cell.  The corrections officer testified that Oliver showed no sign of any medical problem.

At 6:40 a.m., a corrections officer heard Oliver throwing up.  He also requested to see the nurse.  A call to the nurse was placed.  Within a few minutes, Oliver began banging on his door.

2

A corrections officer responded to Oliver, and he complained to the corrections officer that his heart was stopping.  At 6:45 a.m., this corrections officer called the nurse.  At approximately 7:05 a.m., Stephanie Dembie, also a licensed practical nurse, saw Oliver.  His vital signs were all within normal range, with the exception of his pulse, which was 118 beats per minute.  Dembie's notes indicate that Oliver was "tachycardic," in that his pulse fell outside the "normal" range of 60-100.  Oliver informed her that he had smoked crack cocaine seven hours earlier, but denied any other drug use.

In addition, Oliver complained of an upset stomach and diarrhea.  He did not, however, complain that he had vomited, nor did he vomit during the medical visit.  He also informed her that he was upset about being arrested.  Dembie concluded that his elevated pulse was likely a result of the arrest.  She advised him of the side effects of smoking crack and dispensed a dose of Kaopectate.  Based on her observation, no further medical treatment was warranted.

After his examination in the dispensary, Oliver was transported to booking in anticipation of a court appearance.  At approximately 7:53, a corrections officer in the booking department notified a nurse the Oliver was complaining of chest pains.  The nurse instructed the corrections officer to tell Oliver to relax.  At 8:43, the booking log contains the following entry, "nurse notified again to seventeen for booking for [resident] Oliver."  A "code seventeen" is a request for immediate medial assistance from all staff.  At least one of the nurses on duty that day does not recall hearing a code seventeen.  Regardless, three minutes later, a nurse appeared in booking and indicated that Oliver was "fine."  No nurse's report was made for this visit.  At some point, the prison contacted the court and informed it that Oliver was not well enough to appear for his video arraignment.

3

At 10:03 Oliver was escorted back to his cell.[1]  For a short period of time, Oliver appeared to be "all right."  Within fifteen or twenty minutes, Oliver began banging on his cell door and asked to see the nurse.  He began vomiting and urinating on himself.  The corrections officer contacted the nurse's station.  Two nurses came down to the cell.  At this point, Oliver had stopped vomiting, but was drinking large quantities of water and had undressed.  The corrections officer wrapped him in a sheet and sat him down on a "covered register" outside the cell.  When the nurses arrived, they questioned Oliver as to whether he had swallowed anything.  They informed him that they wanted to help him and that he wouldn't be in trouble.  Thereafter, he admitted that he swallowed cocaine and smoked marijuana laced with embalming fluid.  At this point, one of the nurses informed the doctor and also telephoned for an ambulance.  At approximately 10:50 a.m., Oliver was transported to booking and was thereafter taken via ambulance to Elyria Memorial Hospital.  At 3:30 p.m., Oliver was life-flighted to Metro Health Hospital.  He died the following day of a brain hemorrhage caused by acute cocaine intoxication.

The complaint contains three claims for relief.  Count one is a claim for violation of "constitutional rights."  Count two is a state law wrongful death claim.  Count three asserts a claim for negligent failure to train.  Defendants move for summary judgment.  Plaintiff opposes

---

[1]  Plaintiff claims that two officers escorted Oliver back to his cell due to his "deteriorated" condition.  Although the prison's log entry simply says "Res. Oliver; From Court," in the opposite margin two names are listed.  There is no indication, however, that this notation means both corrections officers transported Oliver.  One of the officers testified that the notion "probably meant" that *he* escorted Oliver to his cell.  No deposition testimony was provided from the other officer.  Thus, there is simply no evidence that two corrections officers were needed to transport Oliver due to his deteriorating condition.

4

the motion.

### STANDARD OF REVIEW

In accordance with Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323.  A fact is material only if its resolution might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party pursuant to Federal Rule of Civil Procedure 56(e), which provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.  If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In ruling upon the motion, the court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party.  *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995); *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557,

562 (6th Cir. 1985).  However, summary judgment should be granted if the party bearing the

burden of proof at trial does not establish an essential element of its case.  *Tolton v. American*

*Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. 317).

### DISCUSSION

In counts one and three, plaintiff in essence alleges that defendants violated Oliver's

constitutional rights by failing to provide adequate medical care.  Plaintiff claims that defendants

were deliberately indifferent and acted pursuant to county policy in "allowing plaintiff to die"

without proper medical attention.[2]  Plaintiff alleges, via 42 U.S.C. § 1983, that defendants

violated Oliver's Fifth, Eighth and Fourteenth Amendment rights.

1.      County of Lorain

It is well settled that a Section 1983 claim may be asserted against a municipality only

where the "'execution of a government's policy or custom, whether made by its lawmakers or by

those whose edicts or acts may fairly be said to represent official policy, inflicts the injury'

complained of."  *Graham v. County of Washtenaw*, 358 F.3d 377, 382 (6th Cir. 2004)*(quoting*

*Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978)).  Thus, in order to hold

defendant County of Lorain liable, plaintiff must establish that: (1) a constitutional violation

occurred; and (2) the county is responsible for the violation.  *Id*.  A plaintiff seeking to impose

liability on a municipality on the basis of a "custom or policy," must "identify the policy,

connect the policy to the [County] itself and show that the particular injury was incurred because

---

[2]      Count three alleges a claim for "failure to train," pursuant to 42
U.S.C. § 1983.  The Court finds that the failure to train claim is
more properly analyzed in conjunction with count one, which
specifies the alleged constitutional violation.

6

of the execution of that policy."  *Id*. at 383.  Liability may also be imposed upon a county on the basis of failure to train, where the "failure to train amounts to deliberate indifference."  *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2005).  The alleged constitutional violation must have occurred due to the existence of a particular policy or a lack thereof.  Thus, there must be a 'direct causal link' between the policy (or lack of policy) and the alleged constitutional violation such that the County's 'deliberate conduct' can be deemed the 'moving force' behind the violation."  *Graham*, 358 F.3d at 383 (*citing Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001).

Assuming *arguendo* that Oliver's constitutional rights were violated, the Court finds that Lorain County is nonetheless entitled to summary judgment because plaintiff cannot demonstrate that any such violation was caused by a deliberate indifference on the part of this defendant.  It is undisputed that Lorain County had a general medical plan in place that addressed a wide variety of medical conditions.  The policy specifically addresses abdominal pain, internal bleeding, a variety of heart problems, chest pains and stroke.  Under each category is a list of signs and symptoms and instructions on how to address various medical situations.  In addition, as Lorain County points out, it has repeatedly been accredited by the National Commission on Correctional Health Care for its compliance with the Standards for Health Services in Jails.

Plaintiff, however, claims that Lorain County's failure to have in place a policy specific to handling a drug overdose amounts to deliberate indifference.  In essence, plaintiff claims that the lack of policy is the "moving force" behind the alleged wrongdoing.  In support of her position, plaintiff points out that a large percentage of inmates have serious drug and alcohol

7

problems.[3]  In addition, plaintiff points to the testimony of various corrections officers who testified that they received no training specific to the handling of a drug overdose.

Based on the evidence and arguments presented by the parties, the Court finds that Lorain County's failure to implement a medical policy specifically related to drug overdose and to train their employees in this regard falls far short of establishing deliberate indifference.[4]  As an initial matter, plaintiff presents no evidence that the medical emergency plan in place does not encompass drug overdose symptoms.  Although she claims that she "disputes" the proposition, no supporting evidence is identified.  In addition, all inmates are seen by a nurse at intake and fill out a medical form.  The medical staff at LCCF is comprised of at least two licensed practical nurses and a physician, each of whom attended to Oliver on at least one occasion.  Thus, it appears that Lorain County's "policy" includes staffing LCCF with personnel specifically licensed to handle a broad class of emergency medical situations.  Although there may not be a policy expressly addressing drug overdose, the use of licensed medical personnel, together with a written emergency medical policy, refutes any claim that Lorain County acted with "deliberate indifference" towards Oliver.  *Cf., Blackmore*, 390 F.3d at 900 (question of fact regarding

---

[3]    Although the Court does not disagree with plaintiff's assertion that drugs are indeed a problem in prisons, the Court notes that, for purposes of this case, plaintiff herself presented evidence that the events that transpired at the jail are rare and unusual.  In fact, it does not appear that a drug overdose has ever occurred at the facility.

[4]    Based on plaintiff's arguments, it appears to the Court that the lack of policy and the failure to train claims overlap.  In essence, plaintiff claims that the lack of a drug overdose policy and the failure to train in that regard caused Oliver's constitutional rights to be violated.  Accordingly, these claims will be addressed together.

deliberate indifference where county jail had no medical policy and did not provide a substitute nurse when the on-duty nurse was out ill).  To the extent plaintiff is somehow arguing that the failure to train the corrections officers regarding drug overdose caused Oliver's injuries, the argument is rejected.  On at least four occasions, the corrections officers phoned the medical staff regarding Oliver.  There is simply no indication that the lack of drug overdose training with respect to the corrections officers caused harm to Oliver.  *See, e.g., Graham*, 358 F.3d at 384 (policy allowing medical professionals, as opposed to corrections officers, to assess prisoner's medical needs is "laudable" in many respects).

Plaintiff also appears to argue that nurse Dembie failed to follow the medical emergency policy in place by failing to transport Oliver to the hospital after discovering his elevated pulse rate.  In addition, plaintiff points out that her expert testified that the county failed to adhere to at least ten standards promulgated by the National Commission on Correctional Health Care in its treatment of Oliver.  Thus, according to plaintiff, the fact that the county repeatedly received accolades and is accredited for its compliance with jail health care standards is irrelevant.  In essence, plaintiff argues that in this particular case the policy in place failed to adequately address Oliver's medical needs.  It is well settled, however, that "there can be no municipal liability where 'an otherwise sound program has occasionally been negligently administered.'"  *Id*. at 385.  Federal courts are reluctant to "second guess medical judgments and to constitutionalize claims that sound in state tort law."  *Id*.  Even if Oliver received "woefully inadequate" medical care, there is simply insufficient evidence from which a jury could conclude that the harm resulted from the failure to train employees specifically regarding drug overdose and ingestion.  Accordingly, the Court finds that defendant Lorain County is entitled to summary

9

judgment with respect to counts one and three.

       B.      Sheriff Phil R. Stammitti

Plaintiff also brought suit against Sheriff Phil Stammitti in both his individual and official capacities.

With respect to plaintiff's claims against Stammitti in his official capacity, the Sixth Circuit has explained:

> In an official capacity action, the plaintiff seeks damages not from the individual officer, but from the entity for which the officer is an agent. The Supreme Court has concluded that, 'an official capacity suit is, in all respects other than name, to be treated as a suit against the entity.' *Kentucky v. Graham*, 473 U.S. 159 (1985).

*Pusey v. City of Youngstown*, 11 F.3d 652, 657 (6th Cir. 1993). *See also Alkire v. Irving*, 330 F.3d 802, 810 (6th Cir. 2003) (stating that "individuals sued in their official capacities stand in the shoes of the entities they represent"); *Monell v. New York City Dep't of Social Services*, 436 U.S. 658, 690 n. 55 (1978) ("Official capacity suits . . . represent only another way of pleading an action against an entity of which an officer is an agent.").

Because suits against an individual in his official capacity are tantamount to suits against the governmental entity, the Court finds that its analysis with respect to the lack of a drug overdose policy and any failure to train associated therewith applies with equal force to the claims asserted against Stammitti in his official capacity. It appears, however, that plaintiff also claims that Stammitti should be held liable in his official capacity for failing to properly investigate Oliver's death. Although by suing Stammitti in his official capacity, plaintiff seeks damages from the county, this claim was not directly raised above. As such, the Court will now consider whether the county may be held liable for Stammitti's alleged failure to conduct a proper investigation.

It is undisputed that Stammitti had no contact whatsoever with Oliver.  Although Stammitti holds a supervisory position at the facility, it is well settled that a failure to supervise or properly train due to negligence is an insufficient basis to sustain a finding of liability.  *Leach v. Shelby County Sheriff*, 891 F.2d 1241 (6th Cir. 1990).  Rather,

> [A] failure of a supervisory official to supervise, control or train the offending individual[s] is not actionable absent a showing that the official either encouraged or in some way directly participated in it.  At a minimum a plaintiff must show that the official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending [employees.]

*Id*.  at 1246 (*quoting Hays v. Jefferson*, 668 F.2d 869, 874 (6th Cir. 1982).

Plaintiff does not allege that Stammitti directly participated in the alleged failure to timely transport Oliver to the hospital.  Thus, in order to sustain her claim, plaintiff must introduce evidence that Stammitti "implicitly authorized, approved or acquiesced" in the alleged unconstitutional conduct.  In an effort to satisfy this requirement, plaintiff alleges that Stammitti failed to conduct an adequate investigation and failed to reprimand the individuals "responsible" for Oliver's death.  According to plaintiff, the sheriff's alleged failures in this regard are sufficient facts from which a jury could conclude that the county acted with a deliberate indifference.

In support of her position, plaintiff relies on *Leach*.  In *Leach*, a paraplegic inmate brought suit against the sheriff and mayor after receiving indisputably deplorable treatment.  The plaintiff was forced to remain for long periods of time in his own urine, was not bathed and developed sores on his body.  The Sixth Circuit concluded that the county had a "policy or custom" of deliberate indifference, not only based on the failure to provide proper training to disabled inmates, but also because the sheriff failed to investigate and punish the offenders.  The

11

Court, however, finds *Leach* easily distinguishable from this case.  In *Leach*, there were fourteen

prior instances of similar treatment to paraplegic inmates.  Thus, the court reasoned that the

sheriff should have known that paraplegic inmates received inadequate care.  The court noted

that the failure of the sheriff to investigate and punish the responsible parties was "*further*"

evidence of deliberate indifference.   Unlike *Leach*, there is no history or pattern of overdose at

LCCF.  Thus, as opposed to being "further" evidence of deliberate indifference, the alleged

failure on the part of  the sheriff to investigate and punish the alleged offenders is the *only*

evidence of a policy of deliberate indifference.[5]  Plaintiff does not point to any other instances in

which the sheriff failed to properly investigate similar occurrences.  The Court finds that,

standing alone, this evidence is insufficient as a matter of law to establish a policy or custom of

deliberate indifference.  *See, e.g., Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir.

2005)(finding any failure to investigate distinguishable from *Leach* on the grounds that *Leach*

involved a pattern and practice of failing to investigate); *Daniels v. City of Columbus*,

*unreported*, 2002 WL 484622 (S.D. Ohio 2002).[6]

The Court further finds that Stammitti cannot be liable in his individual capacity.

Stammitti had no contact whatsoever with Oliver.  Although the lack of contact does not

---

[5]     The Court also finds *Marchese v. Lucas*, 758 F.2d 181 (6th Cir.
1985) distinguishable.  In *Marchese*, the corrections officers knew
of a planned assault on an inmate and failed to intervene.  After the
attack, there was evidence of a coverup together with a failure to
conduct a meaningful investigation.  Unlike *Marchese*, there is no
evidence that any individual knew of a "planned" violation of
Oliver's constitutional rights.

[6]     In addition, as defendants point out, there does appear to have been
some investigation conducted.  The Court does not opine,
however, on the thoroughness of the investigation.

automatically end the inquiry, the Court finds that Stammitti's failure to train employees

specifically with regard to overdose does not amount to a constitutional violation.  Nor did the

alleged failure to investigate on the part of Stammitti cause any harm to Oliver.[7]

C.      Count two

In count two, plaintiff asserts a state law claim for wrongful death.  Having disposed of

the federal claims in this lawsuit[8], the Court declines to exercise supplemental jurisdiction over

this claim.  *Valot v. Southeast Local School Dist. Bd. of Educ.*, 107 F.3d 1220 (6th Cir. 1997).

The claim involves unresolved issues of state law and the Court finds that the state court is the

proper forum to address this claim.  Accordingly, count two is dismissed without prejudice.

**<u>CONCLUSION</u>**

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED

with respect to counts one and three.  Count two is DISMISSED without prejudice.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 10/9/06

---

[7]     Notably, plaintiff did not sue any of the medical staff or
corrections officers who did have contact with Oliver.

[8]     It is apparent from the face of the complaint that complete
diversity is lacking.

13